# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS

RACHELLE RAND, ESPERANZA
GOTTSCHAU, and RAMON SOTO on
Behalf of Themselves and All Others
Similarly Situated,

        Plaintiffs,

v.

EYEMART EXPRESS, LLC,

        Defendant.

Case No. 3:24-cv-00621-N

**PLAINTIFFS' RESPONSE IN OPPOSITION
TO DEFENDANT EYEMART EXPRESS,
LLC'S MOTION TO DISMISS**

# TABLE OF CONTENTS

I.  INTRODUCTION.................................................................................................1

II.  STATEMENT OF FACTS ......................................................................................2

III.  LEGAL STANDARD ............................................................................................4

IV.  ARGUMENT .........................................................................................................5

  A.  Plaintiffs have adequately pleaded an Article III injury.......................................5

  B.  Eyemart intercepted Plaintiffs' communications in violation of the Wiretap Statutes .......6

    1.  The party exception does not apply to Eyemart..........................................7

      *i.*  *Eyemart's duplication and forwarding of GET requests does not qualify the Party Exception.* ..........................................................................7

      *ii.*  *Plaintiffs did not consent to Eyemart's use of the Pixel.*............................8

    2.  The crime-tort exception applies to enforce Eyemart's liability under the Missouri and Federal Wiretap Acts........................................................11

    3.  The contents of Plaintiffs' communications were intercepted contemporaneously.......16

    4.  Plaintiffs' Illinois Eavesdropping Claim Was Adequately Pled ..................20

  C.  Plaintiffs alleged which contract terms were breached .................................21

  D.  Plaintiffs had a reasonable expectation of privacy. ....................................22

V.  CONCLUSION .....................................................................................................24

# TABLE OF AUTHORITIES

**Cases**

*B.K. v. Desert Care Network*,
  2024 WL 1343305 (C.D. Cal. Feb. 1, 2024)..........................................................................13

*Barbour v. John Muir Health*,
  2023 WL 2618967 (Cal. Super. Ct. 2023) ............................................................................18

*Barnhart v. Walton*,
  535 U.S. 212 (2002)..............................................................................................................15

*Baysal v. Midvale Indem. Co.*,
  78 F.4th 976 (7th Cir. 2023)..................................................................................................22

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................................................................4

*Brown v. Google LLC*,
  525 F. Supp. 3d 1049 (N.D. Cal. Mar. 12, 2021) .............................................................9, 14

*Christensen v. Harris Cty.*,
  529 U.S. 576 (2000)..............................................................................................................15

*Cook v. Gamestop, Inc.*,
  2023 WL 5529772 (W.D. Pa. Aug. 28, 2023).........................................................................6

*Cousin v. Sharp Healthcare*,
  2023 WL 8007350 (S.D. Cal. Nov. 17, 2023)..................................................................19, 23

*Cousin v. Sharp Healthcare*,
  681 F. Supp. 3d 1117 (S.D. Cal. July 12, 2023).............................................................22, 23

*Cranor v. 5 Star Nutrition, L.L.C.*,
  998 F.3d 686 (5th Cir. 2021)...................................................................................................5

*Cruz v. Abbott*,
  849 F.3d 594 (5th Cir. 2017)................................................................................................4, 5

*Doe v. High-Tech Institute, Inc.*,
  972 P.2d 1060 (Colo. App. 1998)..........................................................................................22

*Doe v. Regents of the Univ. of Cal.*,
  672 F. Supp. 3d 813 (N.D. Cal. May 6, 2023) ......................................................................22

*Eichenberger v. ESPN, Inc.*,
  876 F.3d 979 (9th Cir. 2017)...................................................................................................5

*Fraser v. Nationwide Mut. Ins. Co.*,
    352 F.3d 107 (3d Cir. 2003) ..............................................................................18

*Hazlewood v. Netflix, Inc.*,
    2023 WL 6771506 (Oct. 11, 2023) .......................................................................4

*In re Facebook Inc. Internet Tracking Litig.*,
    956 F.3d 589 (9th Cir. 2020) ................................................................ 5, 7, 8, 23

*In re Grp. Health Plan Litig.*,
    2023 WL 8850243 (D. Minn. Dec. 21, 2023) ...............................................passim

*In re Meta Pixel Healthcare Litig.*,
    647 F. Supp. 3d 788 (N.D. Cal. 2022) .........................................................passim

*In re Nickelodeon Consumer Privacy Litigation*,
    827 F.3d 262 (3d Cir. 2016) ..............................................................................5, 7

*In re Pharmatrak, Inc. Privacy Litig.*,
    329 F.3d 9 (1st Cir. 2003) ..................................................................................18

*In re Zynga Privacy Litig.*,
    750 F.3d 1098 (9th Cir. 2014) ...........................................................................19

*In re: BPS Direct, LLC*,
    2023 WL 8458245 (E.D. Pa. Dec. 5, 2023) ........................................................6

*Kane v. Univ. of Rochester*,
    2024 WL 1178340 (W.D.N.Y. Mar. 19, 2024) .............................................12, 14

*Kurowski v. Rush Sys. for Health (Rush II)*,
    683 F. Supp. 3d 836 (N.D. Ill. July 24, 2023) ............................................15, 20

*Kurowski v. Rush Sys. for Health* (Rush III),
    2023 WL 8544084 (N.D. Ill. Dec. 11, 2023) .....................................................12

*Licea v. Cinmar, LLC*,
    659 F. Supp. 3d 1096 (C.D. Cal. Mar. 7, 2023) .................................................18

*McCully v. Banner Health*,
    2024 U.S. Dist. LEXIS 85232 (D. Ariz. May 10, 2024) ..................................7, 8

*Mekhail v. N. Mem'l Health Care*,
    2024 WL 1332260 (D. Minn. Mar. 28, 2024) ........................................12, 14, 19

*Perry v. Cable News Network, Inc.*,
    854 F.3d 1336 (11th Cir. 2017) ...........................................................................5

*R.C. v. Walgreen Co.*,
    2024 WL 2263395 (C.D. Cal. May 9, 2024) ................................................12, 14

*Rodriguez v. Google LLC*,
    2021 WL 2026727 (N.D. Cal. May 21, 2021) ........................................................14

*Spokeo v. Robins*,
    578 U.S. 330 (2016)........................................................................................................5

*Stark v. United States*,
    2017 WL 1185278 (N.D. Tex. Mar. 6, 2017) ....................................................13

*Steve Jackson Games, Inc.* v. *U.S. Secret Serv.*,
    36 F.3d 457 (5th Cir. 1994)..........................................................................................16

*Sussman v. ABC*,
    186 F.3d 1200 (9th Cir. 1999) ....................................................................................11

*U.S. v. Szymuszkiewicz*,
    622 F.3d 701 (7th Cir. 2010) ......................................................................................18

*U.S. v. Turk*,
    526 F.2d 654 (5th Cir.), *cert. denied*, 429 U.S. 823 (1976) ....................................16

*Vasil v. Keep, Inc.*,
    2018 WL 1156328 (N.D. Ill. Mar. 5, 2018) ..........................................................20

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990)........................................................................................................5

**Statutes**

18 U.S.C. § 2511(2)(d)....................................................................................................11

18 U.S.C. § 2710(8) .......................................................................................................19

720 ILCS 5/14-2(a)(3).....................................................................................................20

R.S. Mo. § 542.402.2(3)..................................................................................................11

**Rules**

*Health Insurance Portability and Accountability Act* (HIPAA)....................................6

*Modifications to the HIPAA Privacy, Security, Enforcement, and Breach Notification Rules*
    *Under the Health Information Technology for Economic and Clinical Health Act and the*
    *Genetic Information Nondiscrimination Act*,
    78 F.R. 5642 (Jan. 25, 2013) ......................................................................................16

## I.   __INTRODUCTION__

Eyemart Express ("Eyemart")[1] was founded "to provide people with access to affordable quality eyewear with same-day speed."[2] To accomplish this goal in the physical world, Eyemart hires and/or partners with doctors to provide eye exams, and sells a large volume of glasses from its retail locations.[3] To aid its efforts in the digital world, Eyemart controls and operates https://www.eyemartexpress.com/ (the "Website"), which allows users to browse its glasses inventory online and locate and contact care providers to schedule eye examinations. ¶¶ 1, 3, 61.

To monitor, track, and share its users' activity, Eyemart sought out and procured the tools it needed from Meta Platforms, Inc. ("Meta") in the form of the Meta Pixel (the "Pixel"). Eyemart added the Pixel to its Website, which was used to monitor, report, and share user activity from the Website to Meta. Information shared with Meta directly by Eyemart ranged *from* which glasses users were searching for or attempting to buy *to* efforts by users to locate eye examination providers and to schedule examinations with those providers.

Users of the Website were not warned that their use of the Website, as a direct result of Eyemart's use of the Pixel, would cause information indicating their health status or receipt of health care to be intercepted by third parties. It does not matter whether Eyemart claims the tracking was also for advertising purposes. At bottom, Eyemart did not seek or obtain consent from users to share their information; Eyemart most certainly failed to obtain the requisite explicit consent from users. Eyemart knew, especially since Meta explicitly warned Eyemart, that it was at risk of violating users' legal protections for health information. Eyemart's motion, therefore,

---

[1] Unless otherwise defined, capitalized terms are defined in Plaintiffs' Class Action Complaint (hereafter, "¶").
[2] *Our Purpose*, Eyemart Express, https://www.eyemartexpress.com/about?anchor=history (last visited June 10, 2024).
[3] *All In One Place*, Eyemart Express, https://www.eyemartexpress.com/lander/all-in-one-place (last visited June 10, 2024).

fails and Plaintiffs' causes of action, including the federal and state wiretap act claims, should be sustained.

## II. <u>STATEMENT OF FACTS</u>

To improve the effectiveness of its Website, Eyemart decided to add the Pixel to its Website, which involved agreeing to Meta's Business Tools Terms, and using overt methods to add the Pixel code to each webpage Eyemart wanted to monitor. ¶¶ 30, 81–87, 89.

Websites operate with a straightforward process: (i) a user tries to visit a webpage at a specific "address" by sending a "HTTP Request"[4] to the server located at that address (¶¶ 48–51); (ii) the server hosting the website then authorizes the user's access, sending an authorization message (the "response") and sending the code associated with the webpage to the user (¶ 51); and, the user's browser finally assembles the code into a functional webpage. ¶ 51.The Pixel is transferred to a user's browser at the same time—in the same transaction, —as when the server sends the website code to the user. *See* ¶¶ 79–90; 85. When the user's browser assembles the webpage code (*see* ¶ 54), the Pixel is activated and automatically begins monitoring user activity. *See* ¶¶ 85–87. These actions are monitored through different "events," each of which track different types of activity. For example, standard events can track when items are added to shopping carts, when users register for a service, when purchases are made, when users start free trials, and when search engines are used by users. Custom events can be made by website developers to trigger under other conditions, as specified by the website developers.

With regard to the Website, the user activity tracked can include adding items to a digital cart, clicking specific buttons on the web page, loading a web page with Pixel code, or even custom

---

[4] HTTP Requests can be made using different request methods. Meta's tracking tools, like the Pixel, tend to use GET requests (*see, e.g.,* ¶¶99, Figure 3; ¶ 101, Figures 4–7), and POST requests. *See* Surya Mattu, et al., *How We Built a Meta Pixel Inspector*, THE MARKUP (Apr. 28, 2022) https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector (last visited June 10, 2024).

designed events, like searching for a specific physical store location. ¶ 94. The website developers pick which specific activities they would like to monitor. ¶ 78 fn. 37. When a user triggers a monitored event, such as clicking on an "add to cart" button or submitting search terms into a search engine, the following instantly occurs: the browser generates a new request for the server, either to load a new webpage or request additional materials (for example, loading a new webpage with search results or otherwise creating a new a graphic to show that items have been added to a cart), repeating the request and authorize process discussed above. When any of these actions are chosen, the Pixel will activate, information relevant to the action is captured (*see, e.g.*, ¶¶ 100–07), bundled with a user's c_user cookie containing their unencrypted Facebook User ID (*see, e.g.,* ¶¶ 108–10), and sent to Meta (¶ 99). This process of monitoring, duplicating, and disclosing occurs within users' browsers, at the moment communications are being sent to a website's server.

Eyemart agreed to Meta's Business Tools Terms as a condition of its use of the Pixel. ¶ 155. The Business Tools Terms make clear to website operators – here, Eyemart – that the Pixel collects user activity information and personal information, matching that information to a user's Facebook profile, and using the resulting profile to target advertising at those users. ¶¶ 76, 137, 157–59. Recognizing that its Pixel could be used to violate privacy rights, Meta explicitly prohibits the use of its tracking tools, including the Pixel, for the purpose of collecting health information, and otherwise requiring that websites using the Pixel have a lawful basis[5] for collecting any information sent to Meta. ¶¶ 160.

Here, Eyemart programmed the Pixel to capture information related to (i) prescription products on its Website, such as details of the product being sought, on its Website, the terms input by users to make any search on the Website, (ii) information related to attempts to schedule an eye

---

[5]    Meta    Business    Tools    Terms,    FACEBOOK    (Section    1(e))
https://www.facebook.com/legal/businesstech?paipv=0&eav=AfY375fgb725ZjQrZEqZyhoJsO63s7_tFmEPfgnFpe%20w1xw5Wldq7ONw04KTB0G0o-i4&_rdr (last visited June 10, 2024).

examination, such as the website, location, and phone number of care providers offering eye exams, and, (iii) by extension, Plaintiffs' status as patients (the "protected health information" or PHI). ¶¶ 61, 62, 99–101, 207. Plaintiffs used the Website to search for prescription products (¶¶ 25–27) and to schedule an eye exam (¶ 25). This tracking of users' PHI could not have occurred unless Eyemart programmed the Pixel to track their PHI.

Eyemart did not alert Plaintiffs to its use of the Pixel, or that its use of the Pixel could result in Plaintiffs' PHI being disclosed. *See* ¶ 164. While Eyemart's Privacy Policy, and HIPAA Privacy Statement admit its status as a HIPAA-covered entity, it undertakes not to use of PHI for marketing noting that "*any* health information" will be covered by its HIPAA policy. ¶¶ 63–64, 148–53 (emphasis added).

## III.  <u>LEGAL STANDARD</u>

"When deciding a Rule 12(b)(6) motion to dismiss, a court must determine whether the plaintiff has asserted a legally sufficient claim for relief[,]" and must consider the complaint in its entirety. *Hazlewood v. Netflix, Inc.*, 2023 WL 6771506, at *1 (Oct. 11, 2023). "A viable complaint must include 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). These factual allegations "must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555. A court generally accepts well-pleaded facts as true and construes the complaint in the light most favorable to the plaintiff. *Hazlewood*, 2023WL 6771506, at *1.

"To establish standing, a plaintiff must show: (1) it has suffered . . . a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury." *Cruz v. Abbott*, 849 F.3d 594, 598 (5th Cir. 2017). "To satisfy the injury-in-fact requirement, a plaintiff must allege an injury that is 'actual or

imminent, not conjectural or hypothetical.'" *Id.* (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).

## IV.   <u>ARGUMENT</u>

### A.   **Plaintiffs have adequately pleaded an Article III injury.**

Plaintiffs sufficiently alleged injury here in that they "suffered an invasion of a legally protected interest that is concrete and particularized." *Cranor v. 5 Star Nutrition, L.L.C.*, 998 F.3d 686, 689 (5th Cir. 2021) (quoting *Spokeo v. Robins*, 578 U.S. 330, 330 (2016)). "When a plaintiff asserts harm to an intangible interest, [courts] look to 'both history and the judgment of Congress' to determine whether that injury satisfies Article III's constitutional minimum." *Id.*  at 690 (quoting *Spokeo*, 578 U.S. at 341). A concrete harm need not be tangible.

Courts have historically found that an invasion of privacy or a disclosure of protected information are concrete injuries that satisfy Article III standing. *See Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017) (finding plaintiffs' statutory claims involving violation of their substantive right to privacy alleged an injury to a concrete interest); *In re Nickelodeon Consumer Privacy Litigation*, 827 F.3d 262, 274 (3d Cir. 2016) (finding claims involving unlawful disclosure of legally protected information were sufficiently concrete for Article III purposes); *Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1341 (11th Cir. 2017) (same).  Defendant's contention that Plaintiffs' lack Article III standing (MTD at 9–10), therefore, fails.

Both history and Congress' judgment support the finding of an injury-in-fact here. As Eyemart notes, "Plaintiffs rely on nearly forty-year-old wiretapping laws" (MTD at 1), establishing a lengthy history of wiretap laws "protect[ing] . . . historical privacy rights." *In re Facebook Inc. Internet Tracking Litig.*, 956 F.3d 589, 598 (9th Cir. 2020). The wiretap statutory provisions "codify a substantive right to privacy, the violation of which gives rise to a concrete injury sufficient to confer standing." *Id.*

Congress advanced and then confirmed its position: by passing the Health Insurance Portability and Accountability Act (HIPAA) in 1996, which created a Privacy Rule, that protected certain types of personal health information (PHI).[6] Defendant, in both its Privacy Policy, and HIPAA Privacy Statement, clearly admit to being a HIPAA-covered entity. ¶¶ 63–64, 148–53. But Defendant's analysis tries to sidestep this fact by relying on cases that in which the plaintiffs did not allege sharing any personal information[7] and did not allege any deception or disclosure of legally protected information, or otherwise highly sensitive information.[8] In addition, both cases involved general consumer retailers that were not alleged to have handled highly sensitive information, as opposed to HIPAA covered entities handling health information. MTD at 9–10; *see In re: BPS Direct, LLC*, 2023 WL 8458245, at *12 (E.D. Pa. Dec. 5, 2023) (involving sporting goods); *Cook v. Gamestop, Inc.*, 2023 WL 5529772, at *4 (W.D. Pa. Aug. 28, 2023) (involving video games). Plaintiffs, for their part, allege that HIPAA-protected PHI was at issue here. *See, e.g.,* ¶¶ 63–67, 200–09.

Thus, Plaintiffs have shown that their injuries satisfy Article III requirements.

## B. Eyemart intercepted Plaintiffs' communications in violation of the Wiretap Statutes

A violation of the Electronic Communications Privacy Act occurs when a defendant has "(1) intentionally; (2) intercepted, endeavored to intercept or procured another person to intercept or endeavor to intercept; (3) the contents of; (4) an electronic communication; (5) using a device."

---

[6] This information includes "demographic information collected from an individual, that is created or received by a covered entity . . . or its employer; and relates to the past, present, or future health, health care, or payment for health care of an individual; and identifies the individual or there is a reasonable basis to believe the information can be used to identify the individual." *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES (Mar. 18, 2024) https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html#ftn20 (last visited June 10, 2024)

[7] *Cook v. Gamestop, Inc.*, 2023 WL 5529772, at *4-5 (W.D. Pa. Aug. 28, 2023) (dismissing claims for lack of standing because plaintiff did not allege any collected information could be connected to her)

[8] *In re: BPS Direct, LLC*, 2023 WL 8458245, at *17 (E.D. Pa. Dec. 5, 2023) ("Unlike the website visitors in *Nickelodeon* and *Google*, session replay Website Users before us do not allege [defendants] deceived them or disclosed legally protected information")

*In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, at 274 . Plaintiffs allege their communications to Eyemart were "intercepted" by joint action between Eyemart and Meta, in that; Eyemart added Meta's the Pixel to its Website, while Meta designed the Pixel, and processed Plaintiffs information to make it usable for Eyemart. *See* ¶¶ 197, 218, 236–241. Defendant argues that Plaintiffs' wiretap claims fail because (1) it qualifies for the party exception; (2) Plaintiffs 'consented' to the tracking at issue; and (3) the information sent to Meta was not sent contemporaneously. *See* MTD at 10–18. These arguments all fail for the reasons below.

### 1.    *The party exception does not apply to Eyemart*

The Missouri and Federal Wiretap Acts contain an exemption from liability for a person who is a "party" to the communication. *See McCully v. Banner Health*, 2024 U.S. Dist. LEXIS 85232, at *7 (D. Ariz. May 10, 2024). The Illinois Eavesdropping Act contains a similar exception. *See* 720 ILCS 5/14-2(a)(3). While this appears to be an issue of first impression in the Fifth Circuit, courts elsewhere, including District Courts in the Ninth Circuit found "simultaneous, unknown duplication and communication of GET requests do not exempt a defendant from liability under the party exception . . . ." *Id.* at *7–8 (quoting *In re Facebook*, 956 F.3d at 608).

Based on its factual point of view on how the protected information at issue here was shared, Eyemart argues that the party exception applies for two reasons: (i) Eyemart supposedly consented to the recording; and (ii) Plaintiffs supposedly consented to the recording. *See* MTD at 10, 16.

### i.    *Eyemart's duplication and forwarding of GET requests does not qualify the Party Exception.*

The party exception is inapplicable to Eyemart's supposed consent to the recording of Plaintiffs' PHI. Where a plaintiff alleges that a defendant "knowingly used software on their website which forwarded private communications to third parties[,]" then "the party exception does not apply as [d]efendant would have shared these communications with entities who were

not original parties to the conversation." *Banner Health*, 2024 U.S. Dist. LEXIS 85232, at *8. Thus, "simultaneous, unknown duplication and communication of GET requests do not exempt a defendant from liability under the party exception . . . ." *Id.* at 7–8 (quoting *In re Facebook*, 956 F.3d at 608 Applying the Ninth Circuit's technical understanding of the duplication of GET requests, "[p]ermitting [Defendant] to engage in the unauthorized duplication and forwarding of an unknowing user's information would render permissible the most common methods of intrusion, allowing the exception to swallow the rule." *In re Facebook*, 956 F.3d at 608.

Eyemart claims it consented to Meta's interceptions of Plaintiffs' communications, MTD at 16–18, and adds that the so-called consent exempts Eyemart from liability under the Wiretap Act. Yet, Meta's terms explicitly prohibit the use of the Pixel to intercept sensitive or otherwise legally protected health-related information. ¶ 160. Eyemart's use of the Pixel to capture health information thereby exceeded the bounds of even Meta's terms regarding the collection of Plaintiffs' communications. Eyemart tries advancing this conflicting argument by restating Plaintiffs' allegations to reframe the Pixel operation as the equivalent of "Plaintiffs handing a . . . printout of their Facebook account to a Meta employee while Plaintiffs are in an Eyemart store . . . ." MTD at 17. A more apt analogy would be Plaintiffs using a courier to send a printout to Eyemart, where Eyemart has a secret deal with courier to copy the printout and send it to a mass mailing service before the printout was delivered to Eyemart, despite the courier and Eyemart making representations that such actions are prohibited.

### ii.       *Plaintiffs did not consent to Eyemart's use of the Pixel.*

Eyemart suggests that Meta's Privacy Policy vindicates its surreptitious collection or personal information with seeking, let alone obtaining consent from its site visitors. *See* MTD at 16. To begin, Eyemart has not brought forward any evidence that Plaintiffs agreed to Meta's Privacy Policies. Eyemart failed its burden on this basis alone. Eyemart has even identified which

of Meta's Privacy Policies were applicable when Plaintiffs created their Facebook accounts. Again, Eyemart failed its burden in showing Plaintiffs consented. Even to the extent Eyemart did show Plaintiffs assented to Meta's terms – and specifically which terms – nowhere does Eyemart mention or disclose its sharing of sensitive health information via Meta's Privacy Policy. *See Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. Mar. 12, 2021) (finding defendant failed to meet its burden in showing consent for wiretap).

Assuming the parties used Meta's most recent Privacy Policy for discussion, or to determine whether notice was given, that Privacy Policy cuts against Eyemart's conclusion. Meta's Privacy Policy advises users that some information sent to Meta may be "subject to special protections under applicable laws . . . "[9] and "[a]ny information with special protections [users] choose to provide such as . . . health . . ." will only be obtained "where [users] have given [their] explicit consent." [10] Eyemart admits that it did not gain explicit consent from Plaintiffs or any site visitors; instead, it tried to benefit from the consent it claims exists in Meta's terms which it further claims (without support) apply to Plaintiffs. In addition, Meta claims that it "requires partners to have the right to collect, use and share your information before giving it to us."[11] Eyemart did not have the right to share Plaintiffs' sensitive information. Eyemart failed to adhere with both of these Meta provisions.

In sum, the choice to share health information with Meta lies with users. Any sharing required additional, explicit consent, which Eyemart never obtained. Eyemart was required to obtain legal rights to collect, use, and share Plaintiffs' information before sending it to Meta via

---

[9] *Privacy Center: Privacy Policy*, FACEBOOK, https://www.facebook.com/privacy/policy/ (last visited June 10, 2024); Moreover, Plaintiffs cannot find Eyemart's quoted language in the Privacy Policy (MTD at 16),
[10] *Id.*
[11] *Privacy Center: Information from partners, vendors and other third parties*, FACEBOOK, https://www.facebook.com/privacy/policy?subpage=1.subpage.4-InformationFromPartnersVendors (last visited June 10, 2024) (confirming Plaintiffs' claims that *websites*, not Meta, are the collectors of users' information and responsible party for Pixel transmissions).

the Pixel.[12]  Eyemart did do so, yet shared the personal information regardless.  It did so despite the fact that Meta prohibits the sharing of "Business Tool Data . . . that [websites] know or reasonably should know . . . includes health . . . information or other categories of sensitive information" (¶ 160). Plaintiffs did not 'consent' to the data sharing by Eyemart and their consent could not have stemmed from any ostensible agreement with Meta, as Defendant claims.

Finally, Eyemart's mistaken belief of how the Pixel operates, combined with its own Privacy Policy, does not help it escape liability. Meta put Eyemart on Notice that the intent and function of the Pixel is to tie website user information with user IDs (¶¶ 157–59).  Despite this, Eyemart—not Meta or the Website's users—added the Pixel to its Website. ¶ 79. Meta did not, and by all accounts could not, add the Pixel to the Eyemart Website.  Plaintiffs, without question, did not add the Pixel to the Website.  Only Eyemart did, or even could have.  Eyemart's Privacy Policy does not warn about any additional sharing irrespective of the presence certain of Facebook cookies (*for example* claiming "[a]ny information we track in this manner is anonymous[,]" without mentioning the impact of the presence of a c_user cookie (¶ 64)).  Despite these facts, Eyemart contends that its Privacy Policy provides adequate notice. To understand Eyemart's interpretation of its Privacy Policy, readers must assume Eyemart had no part in causing the sharing of Plaintiffs' identifying information. But that, as shown, is flatly untrue and contradicts Meta's Privacy Policy and Business Tools Terms. *See* MTD at 17 (claiming Meta, not Eyemart, is the source of disclosed identifying information, and that Eyemart just discloses "when buttons are clicked").  What's more, Eyemart's Privacy Policy terms only mention use of pixels "to enable us to learn which advertisements bring users to our website"[13] and not Eyemart's use of health

---

[12]     *See also* Meta Business Tools Terms, FACEBOOK (Section 1(e)) https://www.facebook.com/legal/businesstech?paipv=0&eav=AfY375fgb725ZjQrZEqZyhoJsO63s7_tFmEPfgnFpe%20w1xw5Wldq7ONw04KTB0G0o-i4&_rdr (last visited June 10, 2024).

[13] *Privacy Policy*, EYEMART EXPRESS, https://www.eyemartexpress.com/support/privacy (last visited June 10, 2024).

information outside of its protection under Eyemart's HIPAA Privacy Statement (¶¶ 148–53). Eyemart has not shown how tracking "button clicks" (MTD at 17) related to scheduling eye exams on its own Website would help Eyemart "to learn which advertisements bring users to [its W]ebsite."[14] Because "the nature of the data collection that plaintiffs agreed to is akin to . . . general internet browsing . . ., the collection of protected health information from a medical provider is a different matter entirely." *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 788, 794 (N.D. Cal. 2022). Since Eyemart collected and used Plaintiffs' health information outside what is allowed under its HIPAA Privacy Statement, which it promises to apply to *any* health information,[15] Plaintiffs were not on notice of Eyemart's tracking based on its Privacy Policy.

### 2. The crime-tort exception applies to enforce Eyemart's liability under the Missouri and Federal Wiretap Acts

The crime-tort exception applies to enforce Eyemart's liability under the Missouri and Federal Wiretap Acts. Even if the Court were to accept Defendant's contention that it qualifies for the "party exception" (it should not), the "party exception" cannot apply where – as alleged here (¶¶ 37, 203) – the "communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d); *see* R.S. Mo. § 542.402.2(3).

The crime-tort exception focuses on whether "the purpose for the interception—its intended use—was criminal or tortious." *Sussman v. ABC*, 186 F.3d 1200, 1202 (9th Cir. 1999) (emphasis in original) (quotation marks and citation omitted). The existence of a lawful purpose does not counteract an interception that was also made for a tortious or unlawful purpose. *Id.*

---

[14] *Id.*

[15] Eyemart's promise to apply its HIPAA protections to *any* health information, made in its Privacy Policy, goes beyond the government's requirement for posting a statutorily mandated HIPAA privacy notice and originates in the Privacy Policy itself, a fact omitted by Eyemart in its brief. *See* MTD at 17, fn.11.

Plaintiffs allege that Eyemart utilized Meta and Meta's tracking tools to intercept their legally-protected communications, resulting in criminal violations of HIPAA and an intrusion into Plaintiffs' seclusion. *See* ¶ 4, 19, 81–89, 201, 203, 218, 244–251. Eyemart acted with intent to share Plaintiffs' sensitive health information. It did so in violation of HIPAA. Eyemart installed the Pixel onto its Website so that it could intercept Plaintiffs' communications with the Website when Plaintiffs' visits and use of the Website to obtain eye-health related goods, to schedule eye exams, and Plaintiffs' specific queries typed into the Website's "Search Bar." ¶¶ 2–5, 17–19, 24, 25–27, 60–61, 109–10 (further alleging Eyemart disclosed this sensitive health information to Meta alongside unique identifiers that reveal the identity of specific individuals).

Multiple federal courts have found substantially identical allegations sufficient to trigger the crime-tort exception.

- *R.C. v. Walgreen Co.*, 2024 WL 2263395, at *15 (C.D. Cal. May 9, 2024) (finding plaintiffs' invasion of privacy claims regarding disclosing over-the-counter health item purchases supported applying crime-tort exception);

- *Kurowski v. Rush Sys. for Health* ("Rush III"), 2023 WL 8544084, at *3 (N.D. Ill. Dec. 11, 2023) (finding allegations "sufficient to invoke the HIPAA exception-to-the-party-exception . . . [and that the complaint] plausibly state[d] a claim for relief under the Wiretap Act");

- *In re Grp. Health Plan Litig.*, 2023 WL 8850243, at *8 (D. Minn. Dec. 21, 2023) (same);

- *Kane v. Univ. of Rochester*, 2024 WL 1178340, at *7 (W.D.N.Y. Mar. 19, 2024) (same);

- *Mekhail v. N. Mem'l Health Care*, 2024 WL 1332260, at *5 (D. Minn. Mar. 28, 2024) (finding plaintiff's alleged violations of HIPAA's disclosure rule, among other state law violations, sufficient to invoke the crime-tort exception);

- *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d at 797 ("plaintiffs may be able to show that the crime-tort exception applies" based on allegations "that the use of patient data for advertising in the absence of express written consent is criminal and tortious");

- *B.K. v. Desert Care Network*, 2024 WL 1343305, at *6 (C.D. Cal. Feb. 1, 2024) (finding the crime-tort exception applicable based on plaintiffs' allegations that defendant intercepted communications regarding "requests to refill prescriptions and appointment scheduling inquires" in "violation of various state tort claims and state and federal laws").

Despite this growing trend among federal courts, Eyemart argues the crime-tort exception does not apply here for three reasons: (i) HIPAA does not contain a private right of action; (ii) Eyemart's purpose was to enhance its business; and (iii) HHS guidance clarifying the applicability of the Privacy Rule to internet tracking tools is not instructive here. MTD at 11–13. Eyemart's argument, at its core is rooted in the same "injury-in-fact" argument lodged by Eyemart, in which it claimed that Plaintiffs were not injured by Eyemart's undisclosed use of the Pixel to capture and redirect Plaintiffs' PHI to Meta. *See* MTD at 12 (noting the crime-tort exception is "confined to instances where the recording party intends to use the recording to harm or injure a recorded party . . . ." (quoting *Stark v. United States*, 2017 WL 1185278, at *4 (N.D. Tex. Mar. 6, 2017))*; see also, supra,* Section IV(A).

First, HIPAA's lack of a private right of action does not excuse Eyemart's action or responsibility nor render Plaintiffs unharmed by Eyemart's actions. *See In re Meta Pixel*, 647 F. Supp. 3d at 802 ("[t]he invasion of privacy triggered by the Pixel's allegedly ongoing disclosure of plaintiffs' medical information is precisely the kind of intangible injury that cannot be remedied by damages"). Eyemart does not cite to authority to support its notion that a lack of a private right of action equates to a lack of harm suffered by the victim of a statutory violation, nor how this somehow insulates Eyemart from any liability whatsoever – including under Wiretap Statutes – on the basis of a lack of private right of action under HIPAA. As discussed, numerous courts have already applied the crime-tort exception under nearly identical circumstances.

Second, whether characterized as "enhance[ing] Eyemart's business" (MTD at 12) or "violat[ing] a user's privacy by tracking their activity" (¶ 124), the fact remains that Eyemart

intended to use the Pixel to intercept and redirect Plaintiffs' communications containing Plaintiffs' search queries, eye exam scheduling information, and eye-related product information to a third party. ¶¶ 16, 19, 155–61. Eyemart maintains, without support, that it cannot be liable because the purpose for its recordings was merely pecuniary. MTD at 14 ("Plaintiffs' allegations are that . . . Eyemart implemented the Meta Pixel on the Eyemart Website to enhance its business . . . ."). But the "existence of a lawful purpose does not sanitize an interception that was also made for an illegitimate purpose." *In re Meta Pixel*, 647 F. Supp. 3d at 797; *see also R.C. v. Walgreen Co.*, 2024 WL 2263395 at *15 ("even where a defendant is arguably motivated by monetary gain, the crime-tort exception may nonetheless apply if plaintiffs have adequately alleged that the defendant's conduct violated state law, including state law privacy claims"). Still, Eyemart argues that profit motives *do* sanitize interceptions made for an illegitimate purpose, and exaggerates the judicial authority, claiming that "similar allegations have ***uniformly*** been dismissed across the country" (MTD at 12) (emphasis added). While this issue is at most unsettled in the Ninth Circuit,[16] other Circuits have not adopted Eyemart's theory. *See Mekhail*, 2024 WL 1332260, at *5 n.4 (the Court expressed "serious doubts that a pecuniary purpose and an injurious purpose can always be so clearly distinguished," observing "it defies common sense that a clearly harmful act could escape liability as long as it was done for profit"); *Kane*, 2024 WL 1178340, at *7 (applying crime-tort exception to profit-motivated defendant); *In re Grp*, 2023 WL 8850243, at *8 (same); *Rush III*, 2023 WL 8544084, at *3 (same).

At bottom, Eyemart intercepted Plaintiffs' communications with intent to disclose PHI for advertisement retargeting— which is, plausibly, a criminal violation under HIPAA's disclosure rules, or a tortious invasion of privacy. ¶¶ 9–10, 19, 62, 72–77, 110, 114–15, 118, 138, 184–212.

---

[16] *Compare Rodriguez v. Google LLC*, 2021 WL 2026727, at *6 fn.8 (N.D. Cal. May 21, 2021) (refusing to apply crime-tort exception where primary motivator is profit) *with Brown v. Google LLC*, 525 F. Supp. 3d at 1067 (applying crime-tort exception to similar matching of data to user profiles by Google).

So, the fact that Eyemart stood to financially profit from its actions does not excuse its conduct "at the pleading stage." *In re Grp.*, 2023 WL 8850243, at *8.

Third, Eyemart asks the Court to disregard the U.S. Department of Health and Human Services' Office for Civil Rights December 22, 2022, Bulletin because the guidance does not deserve deference and because the guidance is being challenged in an unrelated matter in another court. MTD at 13. While it is true one court disregarded this guidance in determining whether a HIPAA violation occurred, another court found the HHS guidance instructive. *Compare Kurowski v. Rush Sys. for Health ("Rush II")*, 683 F. Supp. 3d 836, 843 (N.D. Ill. July 24, 2023) (refusing to apply HHS guidance retrospectively or give it deference) *with In re Meta*, 647 F. Supp. 3d at 792 (noting HHS' guidance when concluding patient status constituted protected information under HIPAA).

Underpinning its finding that the HHS guidance was not owed deference, the court in *Rush II* primarily relied on *Christensen v. Harris Cty.*, 529 U.S. 576, 597 (2000). Two years after *Christiensen*, however, the Court in *Barnhart v. Walton*, 535 U.S. 212, 221 (2002) rejected the idea that an agency interpretation made "through means less formal than 'notice and comment' rulemaking, see 5 U.S.C. §553, does not automatically deprive[s] that interpretation of the judicial deference otherwise . . . due" (rejecting the notion that any such a rule should be extracted from *Christensen*). Instead, the appropriate application of *Chevron* to an agency's interpretation depends on "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time . . . ." *Id* at 222.

Critically, HHS *did* draft the Privacy Rule and *did* release the rule for public comment. ¶ 38. HHS has regularly modified the Privacy Rule after releasing proposals for public comment[17] and, for over a decade, has had final rules in place that speak to and prohibit Eyemart's conduct. *Modifications to the HIPAA Privacy, Security, Enforcement, and Breach Notification Rules Under the Health Information Technology for Economic and Clinical Health Act and the Genetic Information Nondiscrimination Act*, 78 F.R. 5642, 5642 (Jan. 25, 2013) (to be codified at 45 C.F.R. pts. 160 and 164) ("entities should determine whether there is a likelihood that the protected health information released could be re-identified based on the context and the ability to link the information with other available information"); *see In re Meta*, 647 F. Supp. 3d at 792 (noting, under the HHS' 2013 rule changes, a HIPAA violation could occur where a covered entity disclosed "a list of patient names, addresses, and hospital identification numbers"). Thus, the HHS guidance should be considered by a court interpreting HIPAA and its Privacy Rule. At a minimum, here, the HHS guidance provided Eyemart with notice that its use of the Meta Pixel comes with the risk of and may be considered a HIPAA violation. Eyemart had this guidance more than a year before Plaintiffs filed their complaint.

### 3. The contents of Plaintiffs' communications were intercepted contemporaneously.

Under the Federal wiretap act, "[a]n intercept[ion] 'require[s] participation by the one charged with an 'interception' in the contemporaneous acquisition of the communication through the use of the device.'" *Steve Jackson Games, Inc.* v. *U.S. Secret Serv.*, 36 F.3d 457, 460 (5th Cir. 1994) (quoting *U.S. v. Turk*, 526 F.2d 654, 658 (5th Cir.), *cert. denied*, 429 U.S. 823 (1976)); *see* MTD at 14. Eyemart challenges whether the interception of Plaintiffs' communication happened

---

[17] *See Health Information Privacy: The HIPAA Rule*, U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html (last visited June 10, 2024).

contemporaneously with its transmission and whether Plaintiffs' intercepted information contained the "contents" of communications. MTD at 14–16, 18.[18]

Eyemart misquotes Plaintiffs' Complaint to support its argument that the communications at issue are not intercepted contemporaneously. *See* MTD at 14–15. According to Eyemart, Plaintiffs send information to servers hosting the Website (MTD at 15) and after reaching the Website, the communications are sorted through events on the server, and sent from the server to Meta. *Id.* This chain of events is not aligned with Plaintiffs allegations; in fact, it is factually opposite. ¶¶ 46–54, 93–96, 97–125. Plaintiffs allege that the Pixel only operates on user's browsers, whereas Meta's other Business Tool, the Conversions API, operates on a website's server. ¶ 156. In fact, to optimize advertisement performance of the Pixel, Meta "recommend[s] that advertisers implement the Conversions API alongside their Meta Pixel." [19]

Plaintiffs allege that to load a webpage from the Website, they contact servers hosting the Website, which then sends the code for the webpage to their devices. ¶¶ 49–51. Plaintiffs' devices, through Plaintiffs' internet browsers, compile the code and make the webpage visible and functional. ¶ 54. The code for the webpages on the Website includes the code for the Pixel because it was placed there by Eyemart. ¶ 85. After Plaintiffs' devices load the webpage code (including the Pixel) specifically named and employed by Eyemart – on their devices, the Pixel starts monitoring Plaintiffs' prospective communications. ¶ 87. Contrary to Eyemart's allegations, the Pixel, at this point, has not already copied and duplicated the communications on Eyemart's servers. MTD at 15.

---

[18] While Plaintiffs cannot find a single case applying a "contemporaneous" standard to either Illinois' Eavesdropping Act or Missouri's Wiretap Act, even if the "contemporaneous" standard applied to them (which appears unsettled), the result would not change, as Plaintiffs have alleged a "contemporaneous" interception.

[19] *Meta for Developers: Verifying Your Setup*, Facebook, https://developers.facebook.com/docs/marketing-api/conversions-api/verifying-setup#verifying-that-events-are-deduplicated-correctly (last visited June 11, 2024).

The Pixel monitored the actions by Plaintiffs, including buttons clicked, pages loaded, and even custom events (the "Pixel Events"), like when users click on a button to schedule an eye exam. ¶ 94. Once a user triggers a Pixel Event on their browser, the Pixel automatically creates a new HTTP Request on the user's device, which duplicates the information meant to be sent to the Website, and sends the copy to Meta. ¶ 123. In short, this process happens not on the Website servers but in users' browsers, after the communications were created to be sent to the Website, but before the Website received the communication. This is so because the Pixel does not operate on website servers. Eyemart reframed Plaintiffs' allegations as to how the Pixel operates so that it could fit the decisional authority favoring its own position. MTD at 14–16. Had Eyemart accepted the operation of the Pixel as it was alleged in the Complaint the cases it relies on no longer support its argument. *See Fraser v. Nationwide Mut. Ins. Co.*, 352 F.3d 107, 114 (3d Cir. 2003) (concluding accessing emails already received by a server was not 'interception'); *Licea v. Cinmar, LLC*, 659 F. Supp. 3d 1096, 1110 (C.D. Cal. Mar. 7, 2023) (complaint contained bare allegations of recording); *Barbour v. John Muir Health*, 2023 WL 2618967, at *5 (Cal. Super. Ct. 2023) (no interception because plaintiffs alleged the copying of information occurred after reaching its destination). When the Pixel's operation is clarified and understood in the manner alleged here, similar facts have met the contemporaneous requirement. *See, e.g., In re Grp.*, 2023 WL 8850243, at *6 (allegations that websites contemporaneously and intentionally redirected contents to third parties sufficed); *U.S. v. Szymuszkiewicz*, 622 F.3d 701, 706 (7th Cir. 2010) (rejecting "in flight" reading of contemporaneous in favor of functional reading – "if both [interceptor] and [intended recipient] were sitting at their computers at the same time, they would have received each message with no more than an eyeblink in between. That's contemporaneous by any standard"); *In re Pharmatrak, Inc. Privacy Litig.*, 329 F.3d 9, 22 (1st Cir. 2003) (noting "automatic routing program" that "automatically duplicated part of the communication between a user and a . . . client

and sent this information to a third party" was "contemporaneous with the transmission by the internet users to the [client]").

Next, Plaintiffs allege that the "contents" of their communications were intercepted. ¶¶ 194–201. The Federal Wiretap Act defines "contents" as "any information concerning the substance, purport, or meaning of [a] communication," *see* 18 U.S.C. § 2710(8), And courts have held that "a user's request to a search engine for specific information could constitute a communication such that divulging a URL containing that search term to a third party could amount to a disclosure of the contents of a communication." *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108–09 (9th Cir. 2014). Communications intercepted by the Pixel constitute "contents" if they reveal the substance of health queries between a patient and healthcare provider. *In re Meta Pixel*, 647 F. Supp. 3d at 795–96 (observing that "log-in buttons and . . . descriptive URLs . . . are 'contents' within the meaning of the statute . . . because they concern the substance of a communication"); *Cousin v. Sharp Healthcare*, 2023 WL 8007350, at *5 (S.D. Cal. Nov. 17, 2023) ("Plaintiffs allege that their data included personal search queries—such as specialty healthcare providers and treatments for medical conditions—and therefore plausibly conveyed content: their PHI."); *In re Grp.*, 2023 WL 8850243 at *7 (allegations regarding interception of "private information, including 'symptoms, medical conditions, physician lookup, treatment, medication, and scheduling'" were "sufficient to allege covered 'content'"); *Mekhail*, 2024 WL 1332260 at *3 (allegations "that substantive information, including details about medical appointments, conditions, and treatments, was obtained via the Pixel" sufficiently "pleaded that 'contents' were intercepted"); *Rush III*, 2023 WL 8544084 at *3 (allegations relating to "communications about appointments, test results, prescription refills, and other treatment" were sufficiently "contents").

Here, Plaintiffs allege the substantive "contents" of their communications were intercepted, including information related to when and where eye exams were scheduled, attempts to purchase

prescription eyewear[20], and patient status. ¶¶ 25–27, 101–07. These allegations plausibly allege the interception of "contents."

### 4. *Plaintiffs' Illinois Eavesdropping Claim Was Adequately Pled*

The Illinois Eavesdropping Act (IEA) makes it unlawful to "intercept[], record[], or transcribe[], in a surreptitious manner, any private electronic communication to which he or she is not a party unless her she does so with the consent of all parties to the private electronic communication." 720 ILCS 5/14-2(a)(3). The IEA also prohibits a party from "us[ing] . . . any information which he or she knows or reasonably should know was obtained from a . . . private electronic communication in violation of this Article . . . ." 720 ILCS 5/14-2(a)(5); *see* 720 ILCS 5/14-2(c)(2) ("A principal is any person who . . . [k]nowingly derives any benefit or information from the illegal use of an eavesdropping device by another").

Plaintiffs have, as detailed above, adequately pleaded how (i) an "interception" occurred (*see* Section IV(B)); (ii) Eyemart used the Pixel to improperly intercept communications (¶ 78); (iii) the party exception does not apply to Eyemart's actions (*see* Sections IV(B)(1) and (2)); (iv) any applicable terms did not give Plaintiffs notice of Eyemart's acts (*see* Section IV(B)(1)); and (v) Eyemart's acts were surreptitious (*see* ¶¶ 161, 164–65, 167). Plaintiffs have thus properly alleged their IEA claim. *See Rush II*, 683 F. Supp. 3d at 853 (rejecting motion to dismiss IEA claim because defendant knowingly derived a benefit from intercepted communications); *Vasil v. Keep, Inc.*, 2018 WL 1156328, at *6, 8 (N.D. Ill. Mar. 5, 2018) (rejecting defendant's motion to dismiss IEA claims under 720 ILCS 5/14-2(a)(3));

---

[20] Plaintiff Rachelle Rand browsed the Website with the intent to purchase prescription eyewear. Should Plaintiffs be given the opportunity to amend their current complaint, this fact would be included.

### C. Plaintiffs alleged which contract terms were breached

Eyemart's Privacy Policy notes that it is "required by applicable law to maintain the privacy of [users'] health information" (¶ 148) and that "*[a]ny* health information we collect from you on this site will be handled in accordance with the terms of our HIPAA Privacy Statement." ¶ 64 (emphasis added). Notably, the Privacy Policy does not limit "any health information" to "protected health information" as defined by HIPAA, suggesting Eyemart's Privacy Policy and HIPAA Privacy Statement applies to a broader category of information than just statutorily protected information.

Similarly, Eyemart's HIPAA Privacy Statement notes that "protected health information" (PHI) may be used in certain circumstances, but that PHI cannot be disclosed by Eyemart for marketing purposes without prior written authorization by the user, unless the marketing is done face-to-face, or consists entirely of offers of promotional gifts of nominal values. ¶ 149. Eyemart's HIPAA Privacy Statement too includes a catch-all statement that "[o]ther uses and disclosures of your PHI, not described above, will be made only with your written authorization . . . ." ¶ 151. Eyemart also claims that "a central aspect of [its] Privacy Policy is to not disclose more PHI than necessary."[21]

Eyemart clearly violated the terms of its Privacy Policy and HIPAA Privacy Statement. Not all health information was handled in accordance with its HIPAA Privacy Statement, as health information was used for marketing purposes without previous written authorization. ¶¶ 112, 119, 145, 161–62.

Eyemart argues that its Terms, Privacy Policy, and HIPAA Privacy Statement are not valid contracts, despite conditioning "access to and use of the Site . . ." on agreement of its Terms and

---

[21] *Privacy Policy: HIPAA Privacy Statement*, EYEMART EXPRESS, https://www.eyemartexpress.com/support/privacy#hipaa (last visited June 10, 2024).

Conditions, as well as conditioning use of the Website, visiting physical locations, "calling customer service," and " . . . interacting with us in any way, or utilizing any of our services" on acceptance of the Privacy Policy. Plaintiffs alleged that they used the Website in a variety of ways, including to attempt to schedule eye exams and purchase prescription eye wear. This is manifestation enough for acceptance of Eyemart's policies and terms, as drafted by Eyemart.

**D.    Plaintiffs had a reasonable expectation of privacy.**

A reasonable expectation of privacy typically exists where a plaintiff is transmitting health-related information to a medical care provider. *See Doe v. High-Tech Institute, Inc.*, 972 P.2d 1060, 1065 (Colo. App. 1998) ("There is a generally recognized privacy interest in . . . one's health"); *Baysal v. Midvale Indem. Co.*, 78 F.4th 976, 981 (7th Cir. 2023) (noting the private nature of medical details); *In re Meta Pixel*, 647 F. Supp. 3d at 800 (finding similar allegations supported an objectively reasonable expectation of privacy in medically-related information); *Doe v. Regents of the Univ. of Cal.*, 672 F. Supp. 3d 813, 820 (N.D. Cal. May 6, 2023) ("Personal medical information is understood to be among the most sensitive information that could be collected about a person . . . .").

Eyemart's claim that Plaintiffs lacked a reasonable expectation of privacy relies on a case which focused on a different element: whether "the collection and disclosure of a user's browsing history and personal information . . . is . . . highly offensive." *See* MTD at 21 (quoting *Cousin v. Sharp Healthcare*, 681 F. Supp. 3d 1117, 1127 (S.D. Cal. July 12, 2023)). The court in *Cousin* found that while disclosing information such as "names, emails, phone numbers, addresses, social security numbers, browsing histories, and user locations" would not, on their own, rise to the level of "highly offensive," information relating to plaintiffs' health information disclosed through scheduling appointments was "highly offensive." 681 F. Supp. 3d at 1126–27. In *Cousin*, however,

the defendant did not challenge "[p]laintiffs' contention that they have a reasonable expectation of privacy." 681 F. Supp. 3d at 1126.

In a subsequent decision, the court in *Cousin* reiterated privacy concerns for information relating to plaintiffs' "medical conditions and statuses as patients with certain doctors." It noted that determining whether such disclosures "could highly offend a reasonable individual is an issue that cannot be resolved at the pleading stage." *Cousin v. Sharp*, 2023 WL 8007350 at *3 (quoting *In re Facebook*, 956 F.3d at 606).

Eyemart's claims regarding supposed notice provided to Plaintiffs regarding the intrusions has been discussed in Section IV(B)(1), and otherwise reframes Plaintiffs' allegations incorrectly. *See* MTD at 22. Plaintiffs were not merely searching for images for prescription eyewear with the end goal of obtaining images but looking to purchase prescription eyewear[22] from a HIPAA-covered entity. *See* ¶ 60 ("Tracked Users search for, look at, and attempt to purchase medical products from the Website . . ."); ¶ 94 (Eyemart used custom Pixel events such as when users attempted to find the location to purchase their glasses). Similarly, Tracked Users took steps to schedule eye exams at specific locations, revealing the physical location and phone number of the medical providers Plaintiffs were attempting to receive medical treatment from. ¶¶ 61, 94.

That Eyemart continues to minimize Plaintiffs' privacy rights in their medical information as equivalent to "search[ing] for . . . information elsewhere online such as on Amazon or Reddit . . . which are not medical care providers" highlights Plaintiffs' concerns and identifies the source of their injuries: Eyemart's disregard for Plaintiffs' privacy. *See* MTD at 22.

---

[22] Plaintiff Rachelle Rand browsed the Website with the intent to purchase prescription eyewear. Should Plaintiffs be given the opportunity to amend their current complaint, this fact would be included.

## V.     **CONCLUSION**

For the foregoing reasons, Defendant's Motion to Dismiss should be denied. Should the Court conclude that Plaintiffs have not sufficiently pled facts to support any of their claims, Plaintiffs respectfully request permission to amend the complaint to address those at issue.

Dated: June 11, 2024

**LEVI & KORSINSKY, LLP**

Mark S. Reich (PHV forthcoming)
Courtney E. Maccarone (PHV forthcoming)
Gary S. Ishimoto (*pro hac vice*)
55 Broadway, 10th Floor
New York, NY 10006
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: **mreich@zlk.com**
Email: **cmaccarone@zlk.com**
Email: **gishimoto@zlk.com**

*Counsel for Plaintiffs*

Respectfully submitted,

**FOSTER YARBOROUGH PLLC**

*/s/ Patrick Yarborough*
Patrick Yarborough
Texas Bar No. 24084129
patrick@fosteryarborough.com
Jeffrey Lucas Ott
Texas Bar No. 24116864
luke@fosteryarborough.com
917 Franklin Street, Suite 220
Houston, Texas 77002
Telephone: (713) 331-5254
Facsimile: (713) 513-5202
Email: **patrick@fosteryarborough.com**
Email: **luke@fosteryarborough.com**

**MATHIAS RAPHAEL PLLC**

Ori Raphael
Texas Bar No. 24088273
Damon Mathias
Texas Bar No. 24080170
Mathias Raphael PLLC
13101 Preston Road, Suite 501
Dallas, TX 75240
Telephone: (214) 739-0100
Fax: (214) 739-0551
Email: **ori@mr.law**
Email: **damon@mr.law**

*Counsel for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

This is to certify that a true and correct copy of the foregoing has been served via the court's electronic case filing system and upon all counsel of record.

*/s/ Patrick Yarborough*