# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

RACHELLE RAND, ESPERANZA
GOTTSCHAU, RAMON SOTO,
GEORGIANNA LASH, and AARON
MEES on Behalf of Themselves and All
Others Similarly Situated,

        Plaintiffs,

v.

EYEMART EXPRESS, LLC,

        Defendant.

Case No.:3:24-cv-00621-N


**PLAINTIFFS' RESPONSE IN OPPOSITION
TO DEFENDANT EYEMART EXPRESS,
LLC'S RULE 12(B)(6) MOTION TO DISMISS
PLAINTIFFS' FIRST AMENDED
COMPLAINT**

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................... 1

II.   STATEMENT OF FACTS ................................................................................ 2

III.  LEGAL STANDARD........................................................................................ 4

IV.   ARGUMENT..................................................................................................... 5

  A. Plaintiffs Rand, Gottschau, and Soto Cured All Pleading Deficiencies in the Amended Complaint........................................................................................................... 5

  B.  Plaintiffs Lash and Mees Sufficiently Plead Disclosure of Their IIHI to Meta.................... 7

  C. Eyemart Can Only "Eavesdrop" on Communications that it is Party To .............................. 9

  D. HIPAA Violations Do Overcome One-Party Consent Laws................................................. 11

  E. Information Sent to Meta Is Intercepted in Transit............................................................. 13

  F.  Plaintiffs Did Not Consent to Any Tracking at Issue........................................................... 15

  G. Plaintiffs Adequately Plead under Illinois Eavesdropping Statute....................................... 18

  H. Plaintiffs Adequately Alleged a Breach Of Contract ......................................................... 19

  I. Plaintiffs had a Reasonable Expectation of Privacy; Eyemart Invaded That Privacy ........... 20

V.    CONCLUSION................................................................................................. 21

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Am. Hosp. Ass'n v. Becerra,*
   738 F. Supp. 3d 780 (N.D. Tex. 2024) ................................................................. 5, 6

*Barbour* v. *John Muir Health,*
   No. C22-01693, 2023 WL 2618967 (Cal. Super. Ct. 2023) .................................... 14

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ............................................................................................. 4

*Braun v. Phila. Enquirer, LLC,*
   No. 22-cv-4185-JMY, 2023 WL 7455160 (E.D. Pa. Nov. 13, 2023) ........................ 8

*Brown v. Google LLC,*
   525 F. Supp. 3d 1049 (N.D. Cal. Mar. 12, 2021) ...................................... 10, 15, 16

*Castillo v. Costco Wholesale Corp.,*
   Case No. 2:23-cv-01548-JHC, 2024 WL 4785136 (W.D. Wash. Nov. 14, 2024) .......... 6, 12, 13

*Crusader Ins. Co. v. Scottsdale Ins. Co.,*
   54 Cal. App. 4th 121 (1997) ................................................................................ 12

*Cyr v. Orlando Health, Inc,*
   Case No. 8:23-cv-588-WFJ-CPT, ECF No. 37 (M.D. Fla Jul. 5, 2023) ................... 20

*Electrostim Med. Servs. v. Health Care Serv. Corp.,*
   614 F. App'x 731 (5th Cir. 2015) ........................................................................ 19

*Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.,*
   480 S.W.2d 607 (Tex. 1972) ............................................................................... 19

*Hazlewood v. Netflix, Inc.,*
   No. 3:23-CV-1109-N, 2023 WL 6771506 (N.D. Tex. Oct. 11, 2023) ....................... 4

*Heerde v. Learfield Commc'ns, LLC,*
   741 F.Supp.3d 849 (C.D. Cal. July 19, 2024) ................................................. 10, 15

*In re Ambry Genetics Data Breach Litig.,*
   567 F. Supp. 3d 1130 (C.D. Cal. Oct. 18, 2021) .................................................. 11

*In re Grp. Health Plan Litig.,*
   709 F. Supp. 3d 707 (D. Minn. 2023) .................................................................. 20

*In re Meta Pixel Healthcare Litig.,*
   647 F. Supp. 3d 778 (N.D. Cal. Dec. 22, 2022) ............................................... 16, 18

*In re Pharmatrak, Inc.*,
    329 F.3d 9 (1st Cir. 2003)............................................................................. 10, 11, 15

*Javier v. Assurance IQ, LLC*,
    No. 21-16351, 2022 WL 1744107 (9th Cir. May 31, 2022)...................................... 15

*Kane v. Univ. of Rochester*,
    No. 23-cv-6027, 2024 WL 1178340 (W.D.N.Y. Mar. 19, 2024)............................... 12

*Kirsten v. California Pizza Kitchen, Inc.*,
    No. 2:21-CV-09578, 2022 WL 16894503 (C.D. Cal. July 29, 2022) ....................... 19

*Licea v. Cinmar, LLC*,
    659 F. Supp. 3d 1096 (C.D. Cal. 2023) ............................................................... 14

*Martinez v. D2C, LLC*,
    Case No. 23-21394-Civ-Scola, 2024 WL 4367406 (S.D. Fla. Oct. 1, 2024) ............. 8

*Matera v. Google Inc.*,
    Case No. 15-CV-04062-LHK, 2016 WL 5339806 (N.D. Cal. Sept. 23, 2016) .......... 10, 15

*McCully v. Banner Health*,
    No. CV-23-00985-PHX-SPL, 2024 U.S. Dist. LEXIS 85232 (D. Ariz. May 10, 2024) ........... 9

*R.C. v. Walgreen Co.*,
    733 F. Supp. 3d 876 (C.D. Cal. May 9, 2024)............................................... passim

*Roma v. Prospect Med. Holdings, Inc.*,
    Civil Action No. 23-3216, 2024 WL 3678984 (E.D. Pa. Aug. 5, 2024) .................. 11

*St. Aubin v. Carbon Health Techs. Inc.*,
    Case No. 24-cv-00667-JST, 2024 WL 4369675 (N.D. Cal. Oct. 1, 2024)............... 6

*Strong v. LifeStance Health Grp. Inc.*,
    No. CV-23-00682-PHX-KML, 2025 WL 317552 (D. Ariz. Jan. 28, 2025) ............. 12

*Sweat v. Hous. Methodist Hosp.*,
    2024 WL 3070184 (S.D. Tex. June 20, 2024)................................................ 12, 13

*Toy v. Life Line Screening of America LTD*,
    No. 3:23-cv-04651-RFL, 2024 WL 1701263 (N.D. Cal. Mar. 19, 2024) ............... 20

United States v. Szymuszkiewicz,
    622 F.3d 701 (7th Cir. 2010), *as amended* (Nov. 29, 2010)............................. 14

**Statutes**
18 U.S.C. § 2511(2)(d) ................................................................... 9, 10, 15, 16
720 ILCS 5/14-2(a)(3) ................................................................................. 9
R.S. Mo. 542.402(1)(3)................................................................................ 9

# I.    INTRODUCTION

Defendant controls and operates the Eyemart Express website, eyemartexpress.com, including its subdomains (the "Website"). On the Website, users can, browse health-related eye products (the "Browsers"), purchase prescription eyewear (the "Purchasers"), locate a doctor, input their prescription information, and schedule eye examinations. ECF 29, Amended Class Action Complaint ("FAC") ¶¶ 1, 3.[1] Defendant also operates a chain of physical stores in the United States, which perform eye examinations and sell prescription and non-prescription glasses, contact lenses, and sunglasses. FAC ¶¶ 1, 31.

To monitor, track, and share its users' activity, Eyemart sought out and procured the tools it needed from Meta Platforms, Inc. ("Meta," f/k/a Facebook, Inc.) in the form of the Meta Pixel (the "Pixel"). Eyemart added the Pixel to its Website, which was used to monitor, report, and share user activity from the Website to Meta. Information shared with Meta directly by Eyemart ranged *from* which glasses users were searching for or attempting to buy *to* prescription information entered on the Website *to* efforts by users to locate eye examination providers and to schedule examinations with those providers.

Users of the Website were not warned that their use of the Website, as a direct result of Eyemart's use of the Pixel, would cause information indicating their health status or receipt of health care to be intercepted by third-parties. It does not matter whether Eyemart claims the tracking was also for advertising purposes. At bottom, Eyemart did not seek or obtain consent from users to share their information; Eyemart most certainly failed to obtain the requisite explicit consent from users. Eyemart knew, especially since Meta explicitly warned Eyemart, that it was at risk of violating users' legal protections for health information. Eyemart's motion, therefore,

---

[1] Unless otherwise defined, capitalized terms are defined in Plaintiffs' Amended Class Action Complaint ("FAC") (hereafter, "¶" or "FAC").

fails and Plaintiffs' causes of action, including the federal and state wiretap act claims, should be sustained.

## II.    STATEMENT OF FACTS

Websites operate with a straightforward process: (i) a user tries to visit a webpage at a specific "address" by sending a "HTTP Request" to the server located at that address (FAC ¶¶ 50–58); (ii) the server hosting the website then authorizes the user's access, sending an authorization message (the "response") and sending the code associated with the webpage to the user (*Id.*); and, the user's browser finally assembles the code into a functional webpage. *Id*. The Pixel, a user-activity tracking tool provided by Meta , is transferred to a user's browser at the same time—in the same transaction—as when the server sends the website code to the user. *See* FAC ¶¶ 92–102. When the user's browser assembles the webpage code (*see* FAC ¶ 58), the Pixel is activated and automatically begins monitoring and storing user activity in its database. *See* FAC ¶¶ 98–101. These actions are monitored through different "events," each of which track different types of activity. For example, standard events can track when items are added to shopping carts, when users register for a service, when purchases are made, when users start free trials, and when search engines are used by users. Custom events can be made by website developers to trigger under other conditions, as specified by the website developers.

Regarding the Website, the user activity tracked can include adding items to a digital cart, clicking specific buttons on the web page, loading a web page with Pixel code, or even custom designed events, like searching for a specific physical store location. FAC ¶ 107. Website developers pick which specific activities they would like the Pixel to monitor and store. FAC ¶ 91 fn. 39. When a user triggers a monitored event, such as clicking on an "add to cart" button or submitting search terms into a search engine, the following instantly occurs: the browser generates a new request for the server, either to load a new webpage or request additional materials (for

example, loading a new webpage with search results or otherwise creating a new a graphic to show that items have been added to a cart), repeating the request and authorizing the process discussed above. When any of these actions are chosen, the Pixel will activate, information relevant to the action is captured (*see, e.g.*, FAC ¶¶ 113–22), bundled with a user's unique c_user cookie containing their unencrypted Facebook User ID ("FID") (*see, e.g.,* FAC ¶¶ 122–24), and sent to Meta. This process of monitoring, duplicating, and disclosing to Meta for association with the user's FID occurs through users' browsers, at the moment communications are being sent to a website's server.

Defendant took overt steps to put the Pixel on the Website (FAC ¶¶ 4–5) and agreed to the Meta Business Tools Terms as condition of using the Pixel. FAC ¶ 95. Recognizing that the Pixel could be used to violate privacy rights, Meta warns about the use of its tracking tools, including the Pixel, for the purpose of collecting health information, and otherwise requiring that websites using the Pixel have a lawful basis for collecting any information sent to Meta. FAC ¶¶ 187. It is the joint responsibility of both the website developer and Meta to properly handle and prevent the Pixel's improper tracking, transmission, and storage of legally protected private information on Meta's database.

To obtain this information, the Pixel monitors for specific user activity. FAC ¶¶ 91, 100. Here, Eyemart programmed the Pixel to capture information related to (i) prescription products on its Website, such as details of the product being sought and the terms input by users to make any search on the Website, (ii) information related to attempts to schedule an eye examination, such as the website, location, and phone number of care providers offering eye exams, and, (iii) by extension, Plaintiffs' status as patients (collectively the "protected health information" or "IIHI"[2]).

---

[2] In Plaintiffs' FAC, Plaintiffs refer to protected health information as "PHI." The Court (Memorandum Opinion and Order, ECF 28 at 6 ("Mem. Op.")) refers to protected health

FAC ¶¶ 6, 74–75, 112–15, 236.

Plaintiffs here used the Website to search for prescription products (FAC ¶¶ 70–73) and to schedule an eye exam (FAC ¶ 74). This tracking of users' IIHI could not have occurred unless Eyemart programmed the Pixel to track their IIHI. The Pixel then intercepts users' communications with the Website in users' browsers, by copying and redirecting the contents of the communication to Meta. FAC ¶¶ 20, 181, 184. Once Meta receives the Pixel transmissions, it processes the data to allow both the sending website (here, Eyemart) and Meta to better target advertising at its users. FAC ¶¶ 9, 86, 151-152, 163.

Eyemart did not alert Plaintiffs to its use of the Pixel, or that its use of the Pixel could result in Plaintiffs' IIHI being disclosed. *See* FAC ¶ 191. While Eyemart's Privacy Policy and HIPAA Privacy Statement admit its status as a HIPAA-covered entity, and it claims not to use of IIHI for marketing, noting how "*any* health information" will be covered by its HIPAA policy, it nevertheless programmed its Pixel to do just that. FAC ¶¶ 42, 76-77, 177–180 (emphasis added).

## III.   <u>LEGAL STANDARD</u>

"When deciding a Rule 12(b)(6) motion to dismiss, a court must determine whether the plaintiff has asserted a legally sufficient claim for relief[,]" and consider the complaint in its entirety. *Hazlewood v. Netflix, Inc.*, No. 3:23-CV-1109-N, 2023 WL 6771506, at *1 (N.D. Tex. Oct. 11, 2023). "A viable complaint must include 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). These factual allegations "must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."

information as "Individually Identifiable Health Information" or "IIHI." We adopt the Court's use of the term of IIHI here.

*Twombly*, 550 U.S. at 555. A court generally accepts well-pleaded facts as true and construes the complaint in the light most favorable to the plaintiff. *Hazlewood*, 2023 WL 6771506, at *1.

## IV. <u>ARGUMENT</u>

### A. Plaintiffs Rand, Gottschau, and Soto Cured All Pleading Deficiencies in the Amended Complaint.

This Court found that Plaintiffs had not pled facts sufficient to establish what private health information was inputted and transmitted to the Website. Mem. Op. at 8. Plaintiffs Rand, Gottschau, and Soto have cured those deficiencies in the First Amended Complaint. In the original Class Action Complaint, Plaintiffs Rand, Gottschau, and Soto each alleged that they visited the Website to search for products and to schedule appointments with doctors. *See* Class Action Complaint (ECF 1, at ¶¶ 25–27). In their First Amended Complaint, Plaintiffs Rand, Gottschau, and Soto each further alleged that they visited the Website to search for products, including prescription products, and schedule appointments with a doctor, resulting in the disclosure of the name and location of the Eyemart locations. FAC ¶¶ 26–28. These actions required Plaintiffs Rand, Gottschau, and Soto to enter their name, location, and IIHI, including prescription information, which was then shared by Defendant with Facebook. FAC ¶¶ 26–28. Plaintiffs allege that the Pixel is active across the Website, including the prescription product pages and the portion of the Website where users can schedule eye examination. FAC ¶ 134. Plaintiffs further allege that the Pixel duplicates the information obtained from the Plaintiffs' activity on the Website and then sends it to Meta. FAC ¶¶ 136–40.

Defendant relies upon the *American Hospital Association* ruling to argue that there is no way of knowing that the health information being entered on the Website is the personal information of the person logged into a social media website on that device. Defendant misunderstands *American Hospital Association,* where the *only* data at issue was the specific

combination of users' IP addresses and searches performed. *Am. Hosp. Ass'n v. Becerra*, 738 F. Supp. 3d 780, 795 (N.D. Tex. 2024).

Here, identifying information from Plaintiffs' Facebook accounts, Plaintiffs' search terms, Plaintiffs' prescription information, and Plaintiffs' eye exam scheduling information are at issue. The ruling in *American Hospital Association* is inapplicable because the information at issue here is readily linked to the individual plaintiffs via their unique Facebook account, and the browsing activity communicated here is purchasing and exam scheduling activity, not a mere "visit to a[n] [unauthenticated public webpage] addressing specific health conditions or healthcare providers" where the "user's intent on visiting is unknowable." 738 F. Supp. 3d at 789, 795.

Next, Defendant argues that Plaintiffs Rand, Gottschau, and Soto's allegations cannot add factual allegations that would result in a different outcome. The Court recognized that there was a split on the issue of what is and is not covered under HIPAA in these relatively new types of cases. Mem. Op., at 9. Indeed, Courts have denied motions to dismiss involving purchases. *See Castillo v. Costco Wholesale Corp.*, Case No. 2:23-cv-01548-JHC, 2024 WL 4785136, at *7 (W.D. Wash. Nov. 14, 2024) (finding plaintiffs plausibly alleged that defendant violated HIPAA where defendant collected data that "relates to plaintiffs individualized health conditions" where plaintiffs provided prescription information "even though they do not allege that their data were collected while they were logged into their patient portals."); *see also St. Aubin v. Carbon Health Techs. Inc.*, Case No. 24-cv-00667-JST, 2024 WL 4369675, at *10 (N.D. Cal. Oct. 1, 2024) (holding that whether the Pixel was present inside the patient portal is irrelevant, the transmission of a URL containing the nature of an appointment constitutes medical information); *see also R.C. v. Walgreen Co.*, 733 F. Supp. 3d 876, 893 (C.D. Cal. May 9, 2024) (reasoning that an internet user "is very unlikely to purchase" specific health-related items "for reasons unrelated to the user's own health conditions").

Plaintiffs amended their pleading to explain how prescription information is communicated to the Website, the type of content intercepted, and the manner in which the Pixel intercepts Plaintiffs' communication. Plaintiffs Rand, Gottschau, and Soto's reassert that their IIHI was intercepted by Defendant's use of the Pixel. Plaintiff Rand alleged that she used the Website to search for and purchase prescription eyewear and search for and schedule an eye exam appointment. FAC ¶ 16. Plaintiff Gottschau and Plaintiff Soto alleged that they searched for prescription eyewear products FAC ¶ 16, 17.

### B. Plaintiffs Lash and Mees Sufficiently Plead Disclosure of Their IIHI to Meta

Defendant claims Plaintiffs Lash and Mees do not plead disclosure of IIHI to Meta. Eyemart attempts four arguments in support, all of which have either been rejected by courts or deemed inapplicable to a determination at the motion to dismiss stage.

*First*, relying on *American Hospital Association*, Eyemart asserts that there is no way for Meta to know that Plaintiffs needed prescription eyewear for themselves. MTD at 8. *American Hospital Association* is distinguished by *Walgreen Co.,* where the court differentiated between general research done on a public health research website and one who visits and conducts searches on a health-goods retailer website. The Court found that "an internet user might research medical information for reasons unrelated to the user's own health conditions. But an internet user is very unlikely to purchase" specific health-related items "for reasons unrelated to the user's own health conditions." *Walgreen Co*., at 893.

*Second*, Defendant argues that someone else could have been using Plaintiffs' computers to order eyewear or that Plaintiffs could have been ordering eyewear for a relative. MTD at 8. This belies Plaintiffs' allegations. The First Amended Complaint alleged that Plaintiffs were the purchasers of eyewear for themselves on their computers, which were logged into their own

Facebook accounts. Plaintiffs' well-pleaded allegations are to be taken as true at this stage of the proceedings, so such an attack on the merits is inappropriate.[3]

*Third,* Defendant argues that for the relevant information to have been transmitted to Meta by the Pixel, the user must have: "(1) had a Facebook account at the time the [IIHI] was [entered]; (2) used a web browser that didn't block the Pixel by default; (3) been simultaneously logged into the [user's] own Facebook account while [entering] the [IIHI]; (4) been simultaneously logged into Facebook on the same device that the [user] used to [enter] the [IIHI]; (5) been simultaneously logged into Facebook using the same browser through which the [user entered] the [IIHI]; and (6) not deployed any number of browser settings or add on software that would have blocked the Pixel." MTD at 8, quoting *Martinez v. D2C, LLC,* Case No. 23-21394-Civ-Scola, 2024 WL 4367406, at *7-8 (S.D. Fla. Oct. 1, 2024)*.* This raises a host of factual issues that go beyond what any court has done at pleading stages. *See Braun v. Phila. Enquirer, LLC,* No. 22-cv-4185-JMY, 2023 WL 7455160, *4 (E.D. Pa. Nov. 13, 2023) (finding that "it would be more appropriate for the court to evaluate these arguments [whether FID can be equated with PII] on a developed factual record after the Parties have engaged in discovery, rather than at the initial pleading stage"). While each detail proffered by Eyemart may need to be shown at trial, or at a later point in litigation, it need not be pled or proven to the particularized level called for by Defendant at this stage. *Cf. Martinez,* 2024 WL 4367406, at *7-8 (ruling on the conditions occurred at the class certification stage).

*Fourth,* Defendant argues that Plaintiffs do not plead the necessary facts to show that the Pixel on the Website *actually* sent anything to Meta as to these particular Plaintiffs. MTD at 9.

---

[3] Defendant further asserts that Plaintiffs can ship the ordered eyewear to any address, emphasizing a lack of connection between the Facebook account and the device being used. MTD at 8. This assertion has no bearing on the claims.

However, such evidence is not required of Plaintiffs at this stage of proceedings. *See Walgreen Co.,* 733 F.Supp.3d, at 891 (finding that at the motion to dismiss stage, "plaintiffs adequately connect their overarching theory of how defendant's website collected and transmitted users' information to plaintiffs' specific interactions with that website" where plaintiffs provide their actions on defendant's website and allege that such actions would have resulted in the transmission of their information to Meta).

As such, Defendant's Motion as to Lash and Mees should be denied.

### C. Eyemart Can Only "Eavesdrop" on Communications that it is Party To

The Complaint alleges that Eyemart is not the party intercepting of Plaintiffs' communications. Meta is the intercepting party. And, because *Meta* is not a party to the conversation, the party exception (explained here) does not apply.

Defendant argues that it cannot eavesdrop on communications that it is party to. MTD at 9. The Missouri and Federal Wiretap Acts contain an exemption from liability for a person who is a "party" to the communication. 18 U.S.C. § 2511(2)(d) (a person may intercept a communication "where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act . . . ."); R.S. Mo. 542.402(1)(3) (same); *see McCully v. Banner Health*, No. CV-23-00985-PHX-SPL, 2024 U.S. Dist. LEXIS 85232, at *7 (D. Ariz. May 10, 2024). The Illinois Eavesdropping Act contains a similar exception. *See* 720 ILCS 5/14-2(a)(3). In short, there are two exceptions pursuant to 18 U.S.C. § 2511(2)(d): (1) where a party to a communication directly intercepts the communication (the "party exception"); and, (2) where a party to a communication provides prior consent to a third party's interception of the communication (the "consent exception"). Neither the party

exception or consent exception are applicable where the communication is intercepted "for the purpose of committing any criminal or tortious act . . . ." 18 U.S.C. § 2511(2)(d).

Defendant's mere status as a party to the conversation only exempts its conduct where Defendant is the intercepting party. Plaintiffs allege that Defendant installed the Pixel on its Website to allow Meta to intercept Plaintiffs' communications. FAC ¶¶ 5, 20, 98. While Defendant ostensibly benefitted from the intercepted information as part of their business operations and strategy, it was Meta that performed the actual interception. *See, e.g., id.* Simply stated, because Defendant is not the intercepting party, and *Meta* is not a party to the conversation, the party exception does not apply. Defendant cannot demonstrate that: (i) Meta is a party to the communication; or that (ii) a party to the communication consented to Meta's interception.

Further, absent that showing by Defendant, the 'consent' exception cannot apply because "under the [Wiretap Act] in civil cases, . . . it makes more sense to place the burden of showing consent on the party seeking the benefit of the exception . . . .'" *Heerde v. Learfield Commc'ns, LLC*, 741 F.Supp.3d 849, 862 (C.D. Cal. July 19, 2024) (quoting *In re Pharmatrak, Inc.*, 329 F.3d 9, 19 (1st Cir. 2003)). "'[A]s the party seeking the benefit of the exception,' it is [defendant]'s burden to prove consent." *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1063 (N.D. Cal. Mar. 12, 2021) (quoting *Matera v. Google Inc*., Case No. 15-CV-04062-LHK, 2016 WL 5339806, at *17 (N.D. Cal. Sept. 23, 2016)). Defendant has not shown that Plaintiffs provided consent for the use of Meta's Pixel to intercept their IIHI. In fact, Defendant has not stated that it even sought that consent to begin with.

At bottom, the party and consent exceptions do not bar liability for Defendant's violations at the motion to dismiss stage. Nor has Defendant produced any evidence to establish whether it provided effective consent to Meta's interceptions of Plaintiffs' IIHI—nor could it. Specifically, Meta's Business Tools Terms prohibit the use of the Pixel to intercept "health . . . information"

generally or other categories of sensitive information[,]" not just HIPAA protected information. ¶ 187. Even if, *arguendo*, the Court implied Eyemart's consent for Meta's interceptions by using the Pixel, the Terms governing the Pixel explicitly forbade the interception of Plaintiffs' IIHI, limiting such consent to the bounds of Meta's Business Tools Terms. *See In re Pharmatrak*, 329 F.3d, at 20–21 (holding that an intercepting defendant did not establish consent where a joint venture between the intercepting defendant and a website defendant resulted in the interception of plaintiffs' sensitive information and website defendant conditioned the use of the intercepting defendant's service on *not* collecting the sensitive information at issue).

### D. HIPAA Violations Do Overcome One-Party Consent Laws

Plaintiffs cite to Eyemart's HIPAA violations as part of their allegation so that they could appropriately draw a connection to other statutes with private rights of action has been adopted broadly. While Defendant argues that Plaintiffs' reliance on HIPAA is misplaced because HIPAA does not provide a private right of action, courts have rejected this argument within the context of using HIPPA to establish the basis for other claims. *See Roma v. Prospect Med. Holdings, Inc*., Civil Action No. 23-3216, 2024 WL 3678984, at *10 (E.D. Pa. Aug. 5, 2024) (concluding violation of a federal statute with no private right of action could be used as an element of another claim, and that the viability to act "as a hook" was best decided at summary judgment); *Walgreen Co.*, 733 F. Supp. 3d at 896 (concluding HIPAA could be used to establish the basis of other claims, regardless of the fact it offers no "private right of action").

There is a distinction where plaintiffs "are not intending to sue under these statutes [HIPAA]; but 'instead serve the subsidiary function of providing evidence of an element of a pre-existing common law cause of action.'" *In re Ambry Genetics Data Breach Litig.,* 567 F. Supp. 3d 1130, 1142 (C.D. Cal. Oct. 18, 2021) (*quoting Crusader Ins. Co. v. Scottsdale Ins. Co.,* 54 Cal.

App. 4th 121, 125 (1997)). In *Walgreen Co.,* the court found that "a duty may arise from HIPAA and serve as the basis for a negligence claim." *Walgreen Co.*, 733 F. Supp. 3d, at 897.

The use of HIPAA violations to establish the element of other statutes with private rights of action has been adopted broadly. *See Castillo,* 2024 WL 4785136, at *7 (holding crime-tort exception resulting from HIPAA violation applies to use of Pixel on public-facing medical retail pages); *Strong v. LifeStance Health Grp. Inc*., No. CV-23-00682-PHX-KML, 2025 WL 317552, at *5 (D. Ariz. Jan. 28, 2025) (finding that plaintiffs plausibly alleged that crime-tort exception applied where defendants intercepted communications for the purpose violating HIPAA where the Pixel was deployed by defendant captured information received by defendant and then packaged that information with cookies created by Facebook to "transmit both the medical information and identifying information to Facebook").

Similarly, a District Court in Texas has found that the crime-tort exception applies when a medical provider's primary purpose in disclosing patient medical information is commercial. *Sweat v. Hous. Methodist Hosp*., Civil Action No. H-24-775, 2024 WL 3070184, at *4 (S.D. Tex. June 20, 2024). The court in *Sweat* found that, taking the pleaded factual allegations as true at the motion to dismiss stage, a purpose of the disclosure of medical information to a third party through the Pixel was to use patient data for advertising purposes, in violation of HIPAA. *Id.* The court noted that in similar cases involving medical providers transmittal of medical information to a third party through the use of Pixel, courts have applied the crime-tort exception. *See*, *e.g.*, *Kane v. Univ. of Rochester,* No. 23-cv-6027, 2024 WL 1178340, at *7 (W.D.N.Y. Mar. 19, 2024) (holding that the plaintiffs had sufficiently plead that the information disclosed could reasonably identify a person who scheduled an appointment, the provider, and their specialty, in violation of the Wiretap Act); *Mekhail v. North Memorial Health Care*, 726 F. Supp. 3d 916, 928 (D. Minn.

Mar. 28, 2024) (holding that the plaintiffs had sufficiently pled a violation of HIPAA to survive a motion to dismiss).

The crime-tort exception applies here. As such, Defendant's Motion should be denied.

**E. Information Sent to Meta Is Intercepted in Transit**

Plaintiffs pled that the interception of their IIHI occurs in transit. FAC ¶¶ 125, 130-133, 136-140,223-226.  Defendant questions this alleged fact, arguing that the IIHI sent to Meta is not transmitted contemporaneously. *See* MTD at 13. The parties agree that an interception must occur "in transit."  The parties disagree, however, as to when the alleged conduct begins.  In competing facts, Plaintiffs allege the transmission is simultaneous and in transit, while Eyemart claims that Meta does not gain access until after the transmission concludes MTD at 13-14.  Defendant's argument, particularly at the pleading or motion to dismiss stage, fails.

In *Sweat v. Houston Methodist Hosp.,* the plaintiff alleged that a hospital embedded a Facebook tracking pixel on its public website, which collected and shared IIHI with Facebook and other third parties without the plaintiff's knowledge or consent. *Sweat*, 2024 WL 3070184, at *1. The court in *Sweat* found an actionable interception at the motion to dismiss stage because the plaintiffs alleged that the tracking pixel captured communications in real time, while they were in transit, and for a potentially criminal or tortious purpose—namely, disclosing detailed patient health information to third parties in violation of HIPAA and other privacy laws. Consequently, the Wiretap Act claim survived the motion to dismiss, subject to further factual development at the summary judgment stage. *Id.; see also Castillo*, 2024 WL 4785136, at *13 (holding in a similarly pleaded complaint that Plaintiffs adequately allege that Costco intercepted IIHI under HIPAA").

Here, Plaintiffs assert that interception occurs in the moment between the user's click and the website's receipt of the data, effectively using the user's computer as the wiretap device. FAC

¶¶ 25, 64. The cases Defendant cites are distinguishable in that they involve allegations that the defendant passed on information it had already received or were conclusory in nature, providing no details about when the interception occurred. See MTD at 13 (citing *Barbour* v. *John Muir Health*, No. C22-01693, 2023 WL 2618967, at *5 (Cal. Super. Ct. 2023); *Licea v. Cinmar, LLC*, 659 F. Supp. 3d 1096, 1109 (C.D. Cal. 2023)). In contrast, Plaintiffs here maintain the data is intercepted before it reaches Defendant and allege specific details as to how Plaintiffs' IIHI is intercepted. FAC ¶¶ 110–35.

In *United States v. Szymuszkiewicz*, the Seventh Circuit considered the analogy which Defendant submits applies here: that the interception of emails as analogous to "catching a thing in flight," as one might do with a football (MTD at 13-14). The *Szymuszkiewicz* court rejected the application of the analogy and its reasoning demonstrates how Defendant's argument here is premised on a flawed understanding as to how electronic communications travel. Unlike a forward pass on a fixed field, email moves in packets through various servers and routers, not as a single physical item along a dedicated circuit. *Compare* MTD at 13 *with* 622 F.3d 701, 705-6 (7th Cir. 2010)), *as amended* (Nov. 29, 2010) (holding that a football analogy for purposes of electronic Wiretap claims are not analogous). "What's more, it does not matter which computer did the copying . . . [t]he routers, and the computers on both ends, arrange the packets . . . and resend as necessary, so that at least one copy of each of the message's many packets reaches its goal . . . [o]nly at the end are the pieces put back together and an intelligible communication formed." *Szymuszkiewicz*, 622 F.3d at 704. Even where Plaintiffs' computers are "doing the duplication and forwarding, [those devices] w[ere] effectively acting as just another router, sending packets along to their destination . . . ." *Id.* at 706. By the time one of these packets is "caught" by Defendant, the system has already created copies—rendering the notion of a solitary ball in transit obsolete.

### F. Plaintiffs Did Not Consent to Any Tracking at Issue

Eyemart cannot demonstrate that it sought or obtained explicit, or any, consent from Plaintiffs.[4]  Because it did not.  Instead, it seeks to shift the blame on Plaintiffs for (i) signing up for Facebook and then (ii) entering eyewear information on the Website.  MTD at 14-15.

Meta's Privacy Policy states that certain information, including health information, may be "subject to special protections" and requires a user's "explicit consent."[5]  Eyemart lacked the right to share Plaintiffs' sensitive data given their agreement with Meta not to disclose health information without explicit consent. FAC ¶¶ 184–89. Eyemart has not only failed to meet its burden of the consent sought and obtained from Plaintiffs, it failed to comply with Meta's requirements regarding the use of the Pixel.

Eyemart's claim of consent fails for two independent reasons: (1) Eyemart must establish that a party to the communication provided consent to *Meta*, the intercepting party, to be eligible for protection provided by 18 U.S.C. § 2511(2)(d) (providing protection where "one of the parties to the communication has given prior consent to such interception"); and, (2) even where consent provided to Eyemart sufficed for protection pursuant to 18 U.S.C. § 2511(2)(d), Eyemart must show that such consent "explicitly notif[ied] users of the practice at issue." See *Brown*, 525 F. Supp. 3d at 1063. Eyemart fails on both accounts.

---

[4] The burden of proving consent is on Eyemart. "[F]or the consent exception under the [ECPA] in civil cases . . . it makes . . . sense to place the burden of showing consent on the party seeking the benefit of the exception . . . ." *Heerde*, 741 F. Supp. 3d, at 862 (quoting *In re Pharmatrak*, 329 F.3d, at 19). Thus, "'as the party seeking the benefit of the exception,' it is [defendant]'s burden to prove consent." *Brown*, 525 F. Supp. 3d, at 1063 (quoting *Matera*, 2016 WL 5339806, at *17); *see generally Javier v. Assurance IQ, LLC*, No. 21-16351, 2022 WL 1744107, at *2 (9th Cir. May 31, 2022) (holding that the plaintiff met his pleading burden by alleging that he did not provide express consent.).

[5] *Privacy Center: Privacy Policy*, Facebook, https://www.facebook.com/privacy/policy/ (last visited Feb 14, 2025).

For the consent exception to apply, Eyemart must establish that "one of the parties to a communication has given prior consent" to a third party's interception of the communication. 18 U.S.C. § 2511(2)(d). Eyemart has failed to make this showing. As discussed above in Section IV(C), Eyemart could not have consented to Meta's interceptions, as Meta's Terms governing the Pixel explicitly prohibit the interception of Plaintiffs' IIHI. *See also* FAC ¶¶ 184–89. Meta did not offer Defendant *carte blanche* data interception services: Meta conditions use of the Pixel on agreement to the Meta Business Tools Terms, which requires Pixel users, like Eyemart, to agree to limits and conditions to use the Pixel. FAC ¶¶ 187. Any consent provided by Eyemart would be constrained by Meta's Business Tools Terms, which explicitly forbid Eyemart's use of the Pixel to intercept Plaintiffs' IIHI. Thus, Eyemart has failed to show that either Eyemart consented to Meta's interceptions, and any purported consent does not cover Meta's interception of Plaintiffs' legally protected IIHI.

Eyemart also fails to establish that Plaintiffs consented to having their sensitive information shared. Assuming, *arguendo*, Eyemart had shown that Plaintiffs assented to Meta's terms and identified which version of those terms applied, it nowhere demonstrates that Plaintiffs consented to the sharing of health information. *See In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 793 (N.D. Cal. Dec. 22, 2022) (finding defendant's notice must, and failed to, "specifically indicate that Meta may acquire *health data* obtained from Facebook users' interactions with their *medical providers' websites*" to establish users' consented to such practice); *Brown*, 525 F. Supp. 3d, at 1067 (rejecting consent where terms did not expressly authorize the specific form of data collection at issue).

In sum, the choice to share health information with Meta lies with websites using the Pixel. Any sharing of personal information, including IIHI, through the Pixel required explicit consent, which Eyemart never obtained. Eyemart was required to obtain legal rights to collect, use, and

share Plaintiffs' information before sending it to Meta via the Pixel.[6]  Eyemart did not do so. Instead, it used the Pixel to intercept Plaintiffs' communications despite the fact that Meta prohibits the sharing of "Business Tool Data . . . that [websites] know or reasonably should know . . . includes health . . . information or other categories of sensitive information" FAC ¶187. Eyemart has not established how Plaintiffs provided the necessary consent to intercept communication containing health information, and Plaintiffs' consent could not have stemmed from any ostensible agreement with Meta, as Defendant claims.

Eyemart's misstatement as to how the Pixel operates, coupled with its own Privacy Policy, does not shield it from liability. Meta explicitly informs that the Pixel's function is to link website user data with user IDs. FAC ¶¶ 184–89. Despite this warning, Eyemart – not Meta, and certainly not Plaintiffs – embedded the Pixel on the Eyemart Website. FAC ¶ 92. Meta could not have installed the Pixel; nor could Plaintiffs. Only Eyemart could do so.

What's more, Eyemart's Privacy Policy fails to warn about any additional sharing triggered by specific Facebook cookies. It simply claims that "any information we track in this manner is anonymous," without mentioning how a c_user cookie can link user-specific data. FAC ¶¶ 165–89. As a result, Eyemart cannot disclaim responsibility based on its Privacy Policy.

Eyemart's Privacy Policy mentions the use of pixels solely "to enable us to learn which advertisements bring users to our website," and makes no disclosure about using health information outside the scope of its HIPAA Privacy Policy. See ECF 16-2, *Appendix 0007-8*; FAC ¶¶ 177–80. Eyemart does not explain how IIHI—such as information about scheduling eye exams or purchasing prescription eyewear—would help it determine which advertisements draw users to its site. As another court has observed, "the nature of the data collection that plaintiffs agreed to is

---

[6]  *See also* Meta Business Tools Terms, FACEBOOK (Section 1(e)) https://www.facebook.com/legal/businesstech?paipv=0&eav=AfY375fgb725ZjQrZEqZyhoJsO63s7_tFmEPfgnFpe%20w1xw5Wldq7ONw04KTB0G0o-i4&_rdr (last visited February 14, 2025).

akin to . . . general internet browsing . . ., [whereas] the collection of protected health information from a medical provider is a different matter entirely." *In re Meta Pixel*, 647 F. Supp. 3d, at 794. Because Eyemart collected and used Plaintiffs' health information beyond what its HIPAA Privacy Policy permits, Plaintiffs were neither on notice of this collection nor did they consent to it under Eyemart's stated policies. FAC ¶¶ 168-180.

### G. Plaintiffs Adequately Plead under Illinois Eavesdropping Statute

Defendant asserts that because Plaintiffs did not amend their complaint in relation to Illinois Eavesdropping Statute ("IEA"), Count III should be dismissed.[7] MTD at 15-16. Plaintiffs did amend their complaint, however, to show how IIHI was entered and shared, and that Plaintiffs were not given sufficient notice under the Website's or Meta's terms. These allegation tie directly with the analysis as to whether Plaintiffs' IIHI was intercepted in a surreptitious manner.

Plaintiffs do not seek to alter or expand the IEA. Rather, the FAC clarifies how Defendant captures and IIHI by specifying the types of data shared and the processes used to enter and intercept that data. FAC ¶¶ 29, 30, 68–75, 114 *Figures 12 and 13*. Specifically, Plaintiffs have alleged factual details about how the specific prescription eye lens information is communicated to the Website. FAC ¶¶ 68–75 (the FAC details how the prescription information users input into the Website, which can include" "1) spherical data for left and right eyes; 2) cylinder data for left and right eyes; 3) axis data for left and right eyes; 4) pupillary distance; and 5) and prism values" and "any values provided to the Website were 'taken from a valid (not expired) prescription issued to [the Tracked User], signed by a licensed optometrist or ophthalmologist'"). Furthermore, Plaintiffs' have provided screenshots of how this process occurred when they add frames and prescription lenses to their cart for purchase. FAC ¶ 114 *Figures 12 and 13*.

---

[7] Plaintiffs previously briefed their IEA claims (*Plaintiffs' Response in Opposition to Defendant Eyemart Express, LLC's Motion to Dismiss*, ECF 24, at 20) and those same arguments are incorporated by reference and supplemented here.

Plaintiffs provided additional factual details—consistent with the IEA—to support their claim that the disclosed information is precisely the type of protected health data the statute was designed to safeguard. FAC ¶¶ 59-75, 114, 134. Defendant's motion to dismiss IEA claims should therefore be denied.

### H. Plaintiffs Adequately Alleged a Breach Of Contract

Under Texas law, the elements of an implied or express contract are identical, except "in the character and manner of proof required to establish them." *Electrostim Med. Servs. v. Health Care Serv. Corp.*, 614 F. App'x 731, 744 (5th Cir. 2015). Implied contracts "arise[] from the acts and conduct of the parties, it being implied from the facts and circumstances that there was a mutual intention to contract." *Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co.*, 480 S.W.2d 607, 609 (Tex. 1972).

In the absence of an express agreement, courts recognize that the act of receiving private information creates an implied promise not to disclose that information. *See, e.g., Kirsten v. California Pizza Kitchen, Inc.,* No. 2:21-CV-09578, 2022 WL 16894503, at *5 (C.D. Cal. July 29, 2022) (explaining "receipt of PII implies the recipient's assent to protect the PII sufficiently"). This is precisely what happened here. Plaintiffs' claims involve implied promises that relate to the Defendant's receipt of IIHI or medical information and assurances made in Defendant's Privacy Policy and Ecommerce Policy FAC ¶¶ 77, 169–80.[8] The unauthorized disclosure of data violates the implied agreement with Website users and caused Plaintiffs' and Class members' harm. FAC ¶¶ 283–85.

---

[8] For example, Defendant's Privacy Policy recognizes that Eyemart is "required by applicable law to maintain the privacy of your health information." Despite those promises, Defendant disclosed Plaintiffs' IIHI to Meta without Plaintiffs' consent. FAC ¶¶ 4, 18-23, 25, 26-31, 230, 266-268, 283-286.

## I.  Plaintiffs had a Reasonable Expectation of Privacy; Eyemart Invaded That Privacy

Eyemart argues it cannot be liable for invasion of privacy because Plaintiffs signed up for a Facebook account and agreed to have their devices monitored by Meta. MTD at 17.  Plaintiffs, however, never assented to Eyemart using Meta's Pixel (*see* Section IV(F), above) to intercept their health information. Eyemart's current terms are, at best, unclear (FAC ¶¶ 168–80). Eyemart's privacy policy noted that Eyemart only "use[s] third-party tracking services to track non-personally-identifying information about visitors to our Websites in the aggregate" and that "[a]ny information [Eyemart] tracks in this manner is anonymous[ and] limited to usage and volume statistics . . ." (ECF 16-2, *Appendix 0007-8*).

Courts have refused to decide at the pleading stage whether the tracking information on a health-related website is considered highly offensive. *Toy v. Life Line Screening of America LTD*, No. 3:23-cv-04651-RFL, 2024 WL 1701263, at *3 (N.D. Cal. Mar. 19, 2024) (upholding plaintiffs' invasion of privacy claim where the defendant, a healthcare screening provider, installed the Pixel on its health-related website, and that allegations of health information being disclosed were sufficiently "offensive" at the motion to dismiss stage); *In re Grp. Health Plan Litig.*, 709 F. Supp. 3d 707, 713-14 (D. Minn. 2023) (same); *Cyr v. Orlando Health, Inc*, Case No. 8:23-cv-588-WFJ-CPT, ECF No. 37 (M.D. Fla Jul. 5, 2023) (same); *Doe v. Boone Health, Inc. et al*, Case No. 22AC-CC07646 at 8 (Mo. Cir. Ct. July 20, 2023) (same).

Plaintiffs adequately alleged that Eyemart's use of the Pixel was "high offensive" or caused "mental injury to a person of ordinary feelings" as individuals who communicated sensitive IIHI to the Website, not mere retail information related to the purchase of everyday goods. FAC ¶ 203. At the motion to dismiss stage, that is sufficient. *See Toy*, 2024 U.S. Dist. LEXIS 88872 at *9 ("whether [the] alleged intrusion . . . was highly offensive is an issue not suitable for decision on the pleadings").

## V.     <u>CONCLUSION</u>

For the foregoing reasons, Defendant's Motion to Dismiss should be denied. Should the Court conclude that Plaintiffs have not sufficiently pled facts to support any of their claims, Plaintiffs respectfully request permission to amend the complaint to address those at issue.

Dated: February 17, 2025

**FOSTER YARBOROUGH**

By: */s/ Patrick Yarborough*
Patrick Yarborough
Jeffrey Lucas Ott
917 Franklin Street, Suite 220
Houston, TX 77002
Telephone: (713) 331-5254
Facsimile: (713) 513-5202
Email: patrick@fosteryarborough.com
Email: luke@fosteryarborough.com

Mark S. Reich*
Courtney Maccarone*
Gary S. Ishimoto (*pro hac vice*)
**LEVI & KORSINSKY, LLP**
33 Whitehall Street, 17th Floor
New York, NY 10004
Telephone: (212) 363-7500
Facsimile: (212) 363-7171
Email: mreich@zlk.com
Email: cmaccarone@zlk.com
Email: gishimoto@zlk.com

*Counsel for Plaintiff*

**pro hac vice* forthcoming